IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SEASON BLEVINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:08-cv-1196 |
| ) | Judge Trauger |
| FAMOUS RECIPE COMPANY ) | |
| OPERATIONS, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by defendant Famous Recipe Company Operations, LLC (Docket No. 14), plaintiff Season Blevins' response (Docket No. 17), and the defendant's reply (Docket No. 20). For the reasons discussed below, the motion will be denied.

## FACTS

This case arises out of alleged sexual harassment by one of the plaintiff's co-workers.[1] On March 31, 2008, Blevins was hired as a cashier at a Mrs. Winner's Chicken and Biscuits fast food restaurant. The restaurant is owned and operated by the defendant, Famous Recipe Company Operations, LLC ("Famous Recipe").

---

[1] Unless otherwise noted, the facts are drawn from the defendant's Statement of Undisputed and Material Facts (Docket No. 16), the plaintiff's response (Docket No. 18), and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

Blevins, who was 18 years old, worked the night shift four days per week. She typically worked with three or four other employees, including another cashier, a cook, and a "shift leader."[2] One of the cooks she often worked with was Boston Hamer, a married man who was several decades older than Blevins. Several weeks after the plaintiff started working, Hamer began making crude and offensive sexual comments to her, and he sometimes touched her inappropriately. These advances were unwelcome.

For example, at various times, Hamer allegedly told Hill that he wanted to "bend her over and hit her from the back," that he wanted to have oral sex with her, that he could smell her "pussy juices," that he wanted to have anal sex with her, and that he wanted to take the plaintiff to a hotel. Hamer also allegedly tried to feel the plaintiff's breasts, repeatedly touched her thighs and buttocks, took a photo of her backside, and tried to kiss her.

Blevins told one of the shift leaders, Simone Hill, about Hamer's behavior.[3] The plaintiff claims that she complained to Hill about Hamer on four or five separate occasions; Hill also personally witnessed some of Hamer's harassment. Hill did not consider Hamer's conduct to be serious, however, and she took no action. Specifically, Hill did not report the harassment to the restaurant's general manager, Patricia Worner, or Famous Recipe's area manager, Kathy Duncan. Hill testified that she did not want Hamer to get in trouble, because he was supporting his family. Another young female employee had told Hill that Hamer was a "dirty old man," but at her deposition, Hill agreed that Hamer "wasn't that bad a person, he just had a thing for young

---

[2] The plaintiff and the witnesses also variously refer to the shift leader as the shift manager or shift supervisor.

[3] At one point, Blevins also told another shift leader about some of Hamer's conduct.

2

girls." (Docket No. 17, Ex. 1 at 107-08.)

Approximately two weeks after the plaintiff first talked to Hill, Hamer poured water down the back of the plaintiff's shirt. The plaintiff told her mother, Jane Smith, about the incident later that night. Smith also worked at the restaurant as a cashier. The next morning, on June 28, 2008, Smith informed Worner, the restaurant's general manager, of Hamer's conduct.

Worner investigated the complaint that day. She talked to Blevins, who told her about Hamer's comments and his physical harassment. Worner then interviewed Hamer. Because Hamer had worked for Famous Recipe for two years without prior incident, Worner issued an oral warning that required him to stop any harassing conduct, including taking pictures of the plaintiff, spraying the plaintiff with water, or pouring ice down the plaintiff's shirt. A written disciplinary form, signed by Worner and Hamer, made it clear that Hamer could face further discipline or termination if the conduct continued.

On June 30, 2008, Smith called Ashley Ceuninck, who was then Famous Recipe's human resources coordinator, to complain on the plaintiff's behalf. Smith did not report any new incidents of sexual harassment, but she told Ceuninck that after being disciplined, Hamer told the plaintiff to "never fucking talk to [him] again" and told Smith that "he knew where she lived." (Docket No. 16, Ex. 1 ¶ 13.) The area manager, Duncan, immediately began investigating the complaint. Duncan took written statements from the plaintiff, Hill, Hamer, and another cashier. But Hill was not forthcoming about her knowledge of Hamer's harassment, the plaintiff told Duncan that she did not want Hamer to be fired, and Hamer admitted to certain flirtatious conduct but denied any harassment. Duncan ultimately disciplined Hamer with a final written

3

warning advising him that any further inappropriate conduct would lead to termination. The plaintiff claims that Duncan left many of the more serious allegations off of her report. Duncan admitted at deposition that the information she gave Ceuninck was substantially "watered down." (Docket No. 17, Ex. 3 at 79-80.)

Although Hamer stopped making sexual comments after Duncan's investigation, tension between the plaintiff and Hamer persisted. Hamer generally refused to talk to Blevins, to the point that she was forced to communicate food orders to him through Hill. He also allegedly told her, "Don't forget, I know where you fucking live at." (Docket No. 16 Ex. 2 at 119.) The plaintiff's mother testified that Worner denied her requests to transfer the plaintiff to a different restaurant or shift. Blevins ultimately quit her job on July 9, 2008.

An employee handbook given to new hires contains Famous Recipe's sexual harassment policy. The policy provides that harassment will not be tolerated, and it gives details on how employees can notify the company of harassment:

> Any employee who feels he or she has been harassed should immediately notify one of the following people who can and will help you:
>
> • Area Supervisor
> • Director of Operations
> • Vice President/Director of Human Resources – can be reached at [phone number].
> • You may also call the Silent Witness Number at 1-800-[phone number] (CEAP) to report any illegal or improper conduct. Any call to the Silent Witness Number can be made anonymously. . . .
>
> Management employees must report any harassment that they are aware of to their Supervisor, Director of Operations or Human Resources. Any management employee who fails to report

4

> harassment that he or she is aware of may be subject to
> disciplinary action.

(Docket No. 16, Ex. 1 at 6.)

Famous Recipe has another policy, called the RESPECT policy, that advises victims of sexual harassment to notify "any one of the following: your Area Supervisor; your District Vice President; your Vice President; your Director of HR/Training & Development." (*Id.* at 8.) The restaurant has a large poster on display that lists the procedure for reporting sexual harassment and gives the local area supervisor's name and telephone number. Blevins was aware of the RESPECT poster, and she received the handbook containing Famous Recipe's sexual harassment policy.

Multiple witnesses testified that, under Famous Recipe's sexual harassment policy, Hill was obligated to pass any allegations of sexual harassment on to Worner or Duncan. Duncan testified:

> Q. Well, what does your policy and procedures manual say that a . . . shift supervisor or a store manager, lower level supervisor, what are they supposed to do if they know about a complaint of sexual harassment?
>
> A. Then she would contact me. . . .
>
> Q. If Simone had known about any . . . sexual harassment, what was she supposed to do with that information?
>
> A. She should have went to [Worner] and said something to her.

(Docket No. 17, Ex. 3 at 54, 60-61.)

Worner provided similar testimony:

5

> Q. And if a shift leader, for instance, became aware that . . . one employee made sexual comments to another employee[,] . . . [w]hat should Simone Hill have done with that information?
>
> A. She should have – she should have directed it straight to me and disciplined the employee. It should have been documented at that point in time . . . .
>
> Q. If [Hill] would have been given [notice of sexual harassment] by Season Blevins, should that have been reported to you immediately?
>
> A. Yes. She – if it was at nighttime, she should have called me at home, or the next day I should have been notified of that. If she did not do that, I would have disciplined her . . . .
>
> Q. The failure or the decision not to report [sexual harassment] to you by one of your shift managers . . . is that just obvious to you that should have been reported?
>
> A. It's policy. You have to report it. . . .
>
> Q. What about the touching of a female employee? If . . . Simone Hill saw Boston Hamer touch the thigh and/or bottom of Season Blevins . . . should that have been reported to you?
>
> A. Yes. And Boston should have been sent home that night.

(Docket No. 17, Ex. 4 at 13, 25-29.)

Finally, Ceuninck, who is now the defendant's manager of human resources, also testified regarding the company's sexual harassment policy. When asked if a manager should "run [reports of sexual harassment] up the chain of command," she answered: "Yes, absolutely. Simone Hill should have told Patricia Worner." (Docket No. 17, Ex. 5 at 18.)

## **ANALYSIS**

6

The plaintiff asserts a hostile environment sexual harassment claim under the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.*, as well as a claim for constructive discharge. The defendant has filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled to summary

judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Hostile Environment Claim

The plaintiff claims that Hamer's sexual harassment created a hostile work environment for which Famous Recipe is liable. The defendant argues that, once it had proper notice of the alleged harassment, it responded promptly and reasonably. (Docket No. 15 at 10-15.)

In interpreting the Tennessee Human Rights Act, courts look to federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. *Mullins v. Goodyear Tire & Rubber Co.*, 291 Fed. Appx. 744, 746 n.1 (6th Cir. 2008); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001); *Spann v. Abraham*, 36 S.W.3d 452, 463

8

(Tenn. Ct. App. 1999); *see also* Tenn. Code Ann. § 4-21-101(a)(1). The court will thus look to the Sixth Circuit's Title VII jurisprudence to resolve the issues in this case.

To establish a claim of sexual harassment based on hostile work environment, the plaintiff must show that "(1) she is a member of a protected class (female); (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) (citation omitted). The parties agree that there are disputes of material fact regarding the second and third elements, so for the purposes of summary judgment, only the fourth element is at issue.

As to that element, "[a]n employer is vicariously liable for co-worker harassment of which it knew or should have known if it failed to take appropriate remedial action, i.e., if its response manifests indifference or unreasonableness." *Id.* at 277. "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized – or is reasonably believed by a complaining employee to have been authorized – to receive and respond to or forward such complaints to management." *Id.* (citing *Bombaci v. Journal Cmty. Pub. Group, Inc.*, 482 F.3d 979 (7th Cir. 2007)). The employer's response must "exhibit[] such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Blankenship v. Parke Care Ctrs.*, 123 F.3d 868, 874 (6th Cir. 1997).

The key issue here is whether the plaintiff's complaints to Hill, the shift leader, were sufficient to give Famous Recipe notice of the harassment. The Sixth Circuit's language in

9

*Gallagher* is clear – an employer has notice if the plaintiff complains to a "supervisor" whom the plaintiff reasonably believes has been "authorized" to "forward such complaints to management." 567 F.3d at 277. Here, the defendant's sexual harassment policy, which is contained in the employee handbook, states: "Management employees must report any harassment that they are aware of to their supervisor, Director of Operations or Human Resources. Any management employee who fails to report harassment that he or she is aware of may be subject to disciplinary action." (Docket No. 16, Ex. 1 at 6.) Multiple witnesses testified that Hill was, in fact, obligated to report Hamer's harassment. Certainly, the plaintiff could have reasonably believed that Hill was authorized to elevate her complaints. The defendant argues that this belief was unreasonable because Hill never told the plaintiff that she would relay the complaints. (Docket No. 20 at 4.) But given the explicit requirements of the defendant's sexual harassment policy, the plaintiff has at least created a factual dispute on this point.[4]

The question then becomes whether Hill was a "supervisor." The Sixth Circuit has previously defined "supervisor" in the context of supervisor-on-employee harassment cases.[5] For an employee to be a supervisor, "all that is required is that the employee have 'significant control'" of the duties to "hire, fire, promote, and discipline employees." *Howington v. Quality Rest. Concepts, LLC*, 298 Fed. Appx. 436, 437, 441 (6th Cir. 2008) (finding that the "key hourly

---

[4] In its reply, the defendant claims that Blevins' complaints to Hill did not convey knowledge of "severe and pervasive" behavior constituting harassment. (Docket No. 20 at 3.) But Hill testified that the plaintiff told her that Hamer said he wanted to "hit her from the back" and have oral sex with her. (Docket No. 17, Ex. 1 at 28.)

[5] The court concludes that the same definition should apply here. If a supervisor's own harassment can create respondeat superior liability for an employer, it is reasonable that his or her knowledge of a co-worker's harassment can also be imputed to the company.

10

manager" of a restaurant, who had authority to force an employee to leave the restaurant and to suspend employees, was a "supervisor") (citation omitted); *see also Browne v. Signal Mt. Nursery, L.P.*, 286 F. Supp. 2d 904, 918 (E.D. Tenn. 2003) (requiring "some significant degree of control over the hiring, firing, demotion, promotion, transfer, *or* discipline of subordinates") (emphasis added). "Supervisory status is not a formulaic question of title, but a particularized inquiry into the nature and extent of the authority bestowed upon an employee by an employer." *Browne*, 286 F. Supp. 2d at 918. A supervisor's authority can be either formal or informal. *Id.*

There is conflicting evidence regarding the authority possessed by Hill. An affidavit from Ceuninck, Famous Recipe's current manager of human resources, states that shift leaders do not have the authority "to hire, fire, discipline employees, or conduct investigations" and that they "are not designated to receive reports of sexual harassment." (Docket No. 16, Ex. 1 ¶¶ 11-12.) But Worner testified that Hill should have "disciplined the employee" upon learning of sexual harassment and that Hill could send employees home as punishment for misconduct. (Docket No. 17, Ex. 4 at 13, 28-29.) In addition, multiple witnesses – including Ceuninck – testified that, if Hill knew of any sexual harassment, the defendant's harassment policy required her to notify her superiors. This means that shift leaders are a part of management, since the policy only requires "management employees" to report knowledge of sexual harassment. It is thus a jury question whether Hill's authority over the plaintiff made Hill a "supervisor" for Title VII purposes.

The defendant argues that this case can be distinguished factually from *Gallagher* (Docket No. 20 at 5 n.1), but that does change the import of Gallagher's clear language

11

regarding notice to employers. The defendant also argues that *Bombaci*, which is cited in *Gallagher*, held that when an employer sets up a "point person" to accept complaints – as Famous Recipe has done here – "this person becomes the natural channel for making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." 482 F.3d at 984 (citations omitted). On the other hand, "[w]here a point person [i]s not identified or easily accessible, an employer can receive notice of harassment from . . . someone that the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment." *Id.* (second alteration in original) (citation omitted). Because Famous Recipe's policy did not direct employees to file complaints with their shift leaders, the defendant argues, Blevins' complaints to Hill were insufficient to provide notice. (Docket No. 15 at 12; Docket No. 20 at 4-6.)

First, the defendant's harassment policy implicitly, if not explicitly, contemplates that employees may complain to anyone in management, since it requires all "management employees" to elevate any knowledge of harassment. Second, even though the defendant in *Bombaci* had a sexual harassment policy designating a number of "point persons," the Seventh Circuit still considered whether a co-worker to whom the plaintiff complained was, "at the very least, . . . someone whose duties required her to forward sexual harassment complaints to higher management." *Id.* Similarly, in *Parkins v. Civil Constructors*, 163 F.3d 1027 (7th Cir. 1998), when the plaintiff did not use the defendant's explicit procedures for reporting harassment, the court went on to analyze whether she nevertheless reported it "to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Id.* at

12

1037 (citation omitted). In both cases, the court essentially determined whether the co-workers receiving the complaints had sufficient authority to be considered "supervisors." *See id.* ("[The truck dispatcher] also lacked the authority to correct the harassment, had no authority to address grievances, and no authority to terminate or discipline the harassers."); *Bombaci*, 482 F.3d at 984 ("[The co-worker's] most significant tasks . . . were similar to the ones found insufficient to confer supervisory status in *Parkins* . . . .").

Because the plaintiff has presented evidence that Hill was a supervisor, and because the defendant's policy required Hill to report any instance of sexual harassment, a jury could reasonably find that notice to Hill served as notice to Famous Recipe.[6] This result might seem to penalize Famous Recipe for creating a policy that broadly requires all "management employees" to report harassment. But the Sixth Circuit previously faced a similar situation in a supervisor-

---

[6] The defendant cites *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428 (5th Cir. 2005), for the proposition that the plaintiff cannot recover because she unreasonably failed to notify one of the three people explicitly listed in the sexual harassment policy. (Docket No. 20 at 6-7.) In *Harvill*, the employer's policy required employees to report harassment to their immediate supervisor and then, if they remained unsatisfied, to the director of human resources. 433 F.3d at 432. Although the *Harvill* plaintiff complained to her immediate supervisor, she did not speak to the director of human resources after the supervisor's investigation proved insufficient. The Fifth Circuit dismissed the claim because "the employee unreasonably failed to take advantage of the corrective opportunities provided by [the employer.]" *Id.* at 439.

The Sixth Circuit's language in *Gallagher* does not support this stringent requirement. *Gallagher* merely requires that the employer have knowledge of the harassment; an employer gains such knowledge when an employee complains to a supervisor who is obligated to elevate the complaint. 567 F.3d at 277. Furthermore, the *Harvill* court essentially applied the so-called *Ellerth-Faragher* affirmative defense. That defense, which is available in cases of harassment by a supervisor, precludes employer liability if (a) the employer exercised reasonable care to prevent and correct harassing behavior, and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Gallagher,* 567 F.3d at 274 (citation omitted). *Gallagher* holds that the defense does not apply to cases of harassment by co-workers. *Id.* at 277.

13

on-employee harassment case:

> The appellees argue that the low- to mid-level supervisors who witnessed the interactions between [the plaintiffs and the harassing supervisor] had no duty to convey their knowledge to UPS, because these supervisors were not high enough in the company hierarchy and had no authority to control [the harassing supervisor]. This argument might have merit but for the fact that UPS itself has, through its sexual harassment policy, placed a duty on all supervisors and managers to "report[] incidents of sexual harassment to the appropriate management people." *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) (holding that when an employer designates certain employees as implementors of its policy, when those employees become aware of misconduct, the employer "has itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures").

*Clark v. UPS*, 400 F.3d 341, 350 (6th Cir. 2005). In any event, a "reasonable" sexual harassment policy must "at least . . . require supervisors to report incidents of sexual harassment." *Id.*

Finally, a jury could find that Hill's decision to not discipline Hamer and to not address the plaintiff's repeated complaints in any meaningful way for weeks on end qualifies as unreasonable indifference. Although the defendant argues that it responded reasonably once Worner was informed of the harassment (*see* Docket No. 15 at 13-15), it does not claim that Hill's response was prompt or reasonable. The plaintiff's hostile environment claim thus survives summary judgment.

## III.     Constructive Discharge Claim

The plaintiff further alleges that her work environment was so hostile that she was constructively discharged. The defendant again argues that its immediate response to the

14

plaintiff's complaints stopped the sexual harassment, relieving it of any liability.[7]  (*Id.* at 17-19.)

To show constructive discharge, a plaintiff must show that "a reasonable employer would have foreseen the employee's resignation, given the intolerable conditions of employment" – in other words, that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 34 (Tenn. 1996).  "'[S]imple proof of discrimination is not enough to convert an employee's resignation into an actionable constructive discharge.  Instead, there must be, in addition, aggravating factors, constituting at least a continuous and severe pattern of discriminatory treatment.'" *Mitchell v. Six Continents Hotels, Inc.*, No. 3:05-0705, 2006 U.S. Dist. LEXIS 81024, at *31 (M.D. Tenn. Nov. 3, 2006) (quoting *Trepka v. Bd. Of Educ. Of Cleveland*, 28 Fed. Appx. 455, 462-63 (6th Cir. 2002)).  The plaintiff must show "that the harassment is so severe or pervasive that work conditions were intolerable, a showing greater than the minimum required to prove a hostile work environment." *Campbell*, 919 S.W.2d at 34.

Although the defendant concedes that there is a genuine dispute whether Hamer's conduct can "be deemed severe and pervasive" for the purposes of the plaintiff's hostile environment claim (Docket No. 15 at 10 n.5), it argues that his harassment did not create "intolerable" conditions. (*Id.* at 17.)  Given the severity and frequency of Hamer's harassment, the court finds that it is a jury question whether the harassment was "intolerable." *See Ojemudia v. Rite Aid Servs., L.L.C.*, 540 F. Supp. 2d 855, 869 (E.D. Mich. 2008) (allowing constructive

---

[7] Oddly, the plaintiff's response brief does not even mention the defendant's constructive discharge argument.  The court infers that the plaintiff believes that her constructive discharge claim survives for the same reasons that her hostile environment claim survives.

15

discharge claim to go forward because hostile environment claim survived summary judgment); *Troutt v. Charcoal Steak House*, 835 F. Supp. 899, 900, 902 (W.D. Va. 1993) (affirming jury's finding of constructive discharge where the plaintiff's supervisor touched her inappropriately and made vulgar sexual advances, and where the plaintiff "eventually terminated her employment with [the defendant] because of [the supervisor's] deliberately outrageous conduct").

Furthermore, as explained above, it is a factual issue whether the plaintiff's complaints to Hill effectively gave notice to the defendant. None of the constructive discharge cases cited by the defendant involve situations where the employer knew of harassment but ignored it for a significant period of time. Also, following Blevins' complaints to upper management, Hill tacitly approved of an environment so tense that Hamer refused to take food orders from Blevins, and Worner denied a request by the plaintiff's mother to switch Blevins to a different shift. *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1081 (6th Cir. 1999) (affirming jury's finding of constructive discharge because the plaintiff was "increasingly isolated after filing his EEOC claim"); *cf. Ingram v. West*, 70 F. Supp. 2d 1033, 1038 (W.D. Mo. 1999) (finding no constructive discharge where the employer immediately transferred the plaintiff upon discovering the harassment, and the plaintiff had no further contact with the harasser). Accordingly, the court will not dismiss the plaintiff's constructive discharge claim.

16

## CONCLUSION

For all of the above reasons, the defendant's Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge